31 F.3d 573
 HARDEE'S OF MAUMELLE, ARKANSAS, INC., an Indiana
corporation, McNeely-Eubanks Enterprises, an Indiana
partnership, Ronald R. Eubanks, Sharon Eubanks, Lee McNeely
and Rose McNeely, Plaintiffs-Appellants,
v.
HARDEE'S FOOD SYSTEMS, INC., a North Carolina corporation,
qualified and admitted to do business in the State
of Indiana, Defendant-Appellee.
 No. 93-3055.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 17, 1994.
Decided Aug. 4, 1994.
 
 M. Michael Stephenson, McNeely, Sanders, Stephenson & Thopy, Shelbyville, IN, W. Michael Garner (argued), Schnader, Harrison, Segal & Lewis, New York City, for plaintiffs-appellants.
 Donald E. Knebel, Dwight D. Lueck, Barnes & Thornburg, Indianapolis, IN, John F. Dienelt, Ellen R. Lokker (argued), David Ober, Reed, Smith, Shaw & McClay, Washington, DC, for defendant-appellee.
 Before BAUER and CUDAHY, Circuit Judges, and MORAN, District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 The McNeely and Eubanks families decided to open a Hardee's restaurant, touted in the Hardee's literature as "the last great franchise opportunity in America." After several meetings with Hardee's Food Systems, Inc. (Hardee's) officials, the McNeelys and Eubanks opened a restaurant in Maumelle, Arkansas. Sales did not go well, and the McNeelys and the Eubanks discovered that they could not expand their franchise as they had hoped. They brought this diversity action against Hardee's on various theories of fraud. The district court entered judgment in favor of Hardee's, and we affirm.
 
 I.
 
 2
 In May 1990, Lee McNeely, a practicing attorney in Indiana, applied to become a Hardee's franchisee and received a Hardee's Franchise Offering Circular. Ronald Eubanks, also an Indiana resident, agreed to come on board as an on-site manager, but emphasized that he wanted multiple franchise units and an income of $50,000. McNeely and Eubanks formed McNeely-Eubanks Enterprises (M-E) to own the Hardee's franchise, and the Hardee's of Maumelle, Arkansas, Inc. (HOMAI) corporation to operate the restaurant.
 
 
 3
 McNeely and Eubanks decided to pursue opportunities in Arkansas. In July, they travelled to Little Rock to meet with Gary Lee, Director of Franchise Development for Hardee's Area V, and Tim Mosbacher, Senior Real Estate Manager for Area V. The entourage visited an existing store in Sheridan--described by the Hardee's officials as a "million dollar store"--and a proposed site for a new store in Fordyce. McNeely and Eubanks said that they were interested in multiple franchises and that they wanted to grow rapidly. Lee and Mosbacher explained that company policy required a franchisee to wait six to twelve months before building a second store, but discussed the possibility of expanding more rapidly by purchasing company-owned stores.
 
 
 4
 On August 2, 1990, McNeely and Eubanks submitted a franchise business plan to Hardee's Area V. In the plan, they requested information regarding the opportunity to expand the scope of their enterprise by purchasing existing company-owned restaurants in addition to expanding through new franchise units. In a subsequent all-day meeting with Area V employees, McNeely and Eubanks did not ask about purchasing company-owned restaurants. The plaintiffs claim that even after this meeting, however, Hardee's employees led them to believe that they could purchase company-owned stores, and that at one point Gary Lee told McNeely that all company-owned stores in Arkansas would be available for purchase.
 
 
 5
 In September 1990, Hardee's suggested that McNeely develop the Maumelle rather than the Fordyce location. Hardee's sent McNeely the Maumelle site package, which included a "Cost Estimate & Site Approval Presentation" Hardee's had developed for its own use in 1989-90 when it was considering developing the Maumelle site as a company-owned restaurant. The Cost Estimate listed three Hardee's representatives' sales estimates for the first year of the Maumelle site as $800,000, $825,000 and $800,000. The plaintiffs claim that Mosbacher assured them that he expected the Maumelle store to be another "million dollar store."
 
 
 6
 As part of an application for financing from AT & T Commercial Finance, Eubanks prepared operating pro formas using the gross sales estimates provided in the Maumelle site package. Eubanks asked Lee to review his draft pro formas to see if they were in proper form; Lee assured him that they were basically sound. Eubanks also produced other pro formas which contained gross sales figures which varied from $600,000 to at least $1.2 million.
 
 
 7
 In the fall of 1990, Eubanks quit his job and moved to Indiana with his wife, Sharon Eubanks, to begin training at a Hardee's store in Arkansas. On November 14, 1990, Lee and Rose McNeely (Lee's wife) signed a licensing agreement with Hardee's and officially became franchisees. The Maumelle restaurant began operation in late February 1991. It performed more poorly than expected, with gross sales of $508,000 during the first year of operation and $611,000 the second year.
 
 
 8
 Meanwhile, in early November 1990, Mosbacher told McNeely and Eubanks about a proposed restaurant site in Russellville, Arkansas. McNeely and Eubanks sought to develop the Russellville site and also to buy an existing Russellville store to provide cash for the development. But in June 1991, John Lentz, the Hardee's Area V Vice President, refused to sell the existing Russellville restaurant, informing the plaintiffs that Hardee's rarely sold company-owned restaurants. Lentz later testified that no Arkansas company-owned stores were for sale in 1990 or 1991. Disappointed, McNeely and Eubanks canceled their plans in Russellville.
 
 
 9
 The plaintiffs brought suit against Hardee's alleging fraud in the sale of the Maumelle franchise. The alleged misrepresentations fell roughly into two groups: claims based on Hardee's sales estimates for its Arkansas stores, and claims based upon Hardee's statements about the possibility of buying company-owned stores after developing the Maumelle site (the "build one-buy one" policy).
 
 
 10
 The district court granted in part and denied in part Hardee's motion for summary judgment.[1] The plaintiffs appeal only from the summary judgment in favor of Hardee's on the claim that Hardee's violated the disclosure provisions of the Indiana Franchise Act (IFA), Ind.Code Secs. 23-2-2.5-9 & 10. The district court held a bench trial on the remaining claims alleging fraud under the IFA, Ind.Code Sec. 23-2-2.5-27, and FTC disclosure rules; Indiana common law; Arkansas common law; and fraudulent concealment and constructive fraud under Arkansas law. The district court found in favor of Hardee's on all counts, and the plaintiffs appeal.
 
 II.
 
 11
 Before we address the plaintiffs' various causes of action, it is useful to consider separately the linchpin of the case. The district court found after the bench trial that the plaintiffs did not actually rely, or were not entitled to rely, on Hardee's alleged misrepresentations when deciding to enter into the Maumelle transaction. The plaintiffs dispute these findings, often indirectly or under the guise of arguments that the district court applied an incorrect legal standard. We will reverse a district court's findings of reliance only if they are clearly erroneous, Rowe v. Maremont Corp., 850 F.2d 1226, 1234 (7th Cir.1988), and, although the plaintiffs point to disputed issues of fact, they have not shown that the district court clearly erred in resolving these disputes.
 
 
 12
 With respect to the "build one-buy one" policy, the district court found that the plaintiffs had not actually relied upon such a policy when deciding to buy the Maumelle store. In particular, the district court noted that the business plan McNeely and Eubanks submitted to Hardee's did not mention a "build one-buy one" policy, but only requested more information on buying company-owned restaurants. The plaintiff's application for financing from AT & T Commercial Finance also did not reference a "build one-buy one" policy, but only the possibility that the plaintiffs might develop additional sites.
 
 
 13
 The district court also concluded that, even if the plaintiffs relied on Hardee's statements, such reliance was unreasonable. For the most part, Lee, Mosbacher and Mike Gent (another Hardee's employee) spoke only about the possibility of selling company-owned restaurants, but neither agreed to sell any restaurants nor stated that the company had a definite policy. The district court found that reliance upon Gary Lee's statement that all company-owned restaurants in Arkansas were for sale was unreasonable. Moreover, although the parties dispute this, the district court found that McNeely and Eubanks knew that any purchase of a company-owned restaurant had to be approved by headquarters in Rocky Mount, North Carolina, and that Mosbacher and Lee had no authority to sell a restaurant. The plaintiffs never inquired of Rocky Mount before opening Maumelle, and never asked that the policy of selling company-owned stores be put in writing. Moreover, it would have been particularly unreasonable for McNeely to rely on any of these representations since he had signed a licensing agreement containing an integration clause that McNeely, a lawyer, must have understood.[2] The district court properly concluded, "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying."
 
 
 14
 The district court made similar findings with respect to the plaintiffs' claims that they relied on Hardee's representations that the Maumelle store would generate $800,000 sales. The plaintiffs argued that they relied on Lee's review of the pro formas prepared by Eubanks for AT & T, but the district court found that the plaintiffs only relied on Lee's statements that the pro formas looked good enough to submit; they did not take his statement as an assurance that the sales estimates were correct. Moreover, Eubanks prepared his own pro formas using sales estimates ranging from $600,000 to $1.2 million; although there was conflicting testimony, the district court found that he had relied on these figures, not the Hardee's figures, in deciding to move to Arkansas. And the McNeelys' claims of reliance on sales estimates rang false again in light of the integration clause.
 
 
 15
 Again, the district court found that even if the plaintiffs had relied on the sales estimates in deciding to go ahead with the Maumelle store, such reliance was unreasonable. All of the plaintiffs signed a release acknowledging that Hardee's "has not made any statements regarding the profitability of any restaurant to be operated by franchisee." McNeely also signed a separate clause of similar import in the licensing agreement. As the district court found, "estimates or predictions of future gross sales of an undeveloped restaurant--even if the estimates are said to be conservative and are made by someone who claims to have uncommon expertise and success in making these estimates--are not worthy of reliance to the extent that it is reasonable or justified to believe that there is nearly no risk that the restaurant will not meet or exceed the gross sales estimate."
 
 
 16
 The Hardee's personnel were probably irresponsible in providing sales figures for the Maumelle store and dangling the opportunity to buy a company-owned store when this was only a remote possibility. But the district court was entitled to weigh the evidence, and gave clear and substantial reasons for its conclusions that the plaintiffs did not actually rely on these representations. The district court knew that McNeely and Eubanks were professionals, and that they either did know or should have known better than to enter into a transaction on the basis of unwritten, unspecified terms. And the district court was within its discretion to reject McNeely's testimony that he expected the Maumelle store to be a virtually risk-free investment--again, based only on the $800,000 figure in the circular and Hardee's representations that it was a good site. We will not reject the district court's findings that the plaintiffs did not reasonably rely on Hardee's representations in entering the Maumelle transaction.
 
 III.
 
 17
 Rose and Lee McNeely claim that Hardee's violated the disclosure provisions of the Indiana Franchise Act, Ind.Code Secs. 23-2-2.5-9 & 10, by failing to substantiate their earnings claims about the existing Arkansas restaurants and by failing to provide Rose McNeely with an offering circular before she executed the franchise agreement. The IFA requires a franchisor who makes a representation about projected earnings of existing establishments to include these claims in the offering circular,[3] but the McNeelys' circular contained no such information. The district court granted summary judgment in favor of Hardee's on this claim, holding that the IFA does not provide a private right of action for violations of the disclosure provisions.
 
 
 18
 Indiana appellate courts have held that the IFA creates a private right of action only for acts which constitute fraud, deceit or misrepresentation. Moll v. South Central Solar Systems, 419 N.E.2d 154, 162 (Ind.App.1981); Master Abrasives Corp. v. Williams, 469 N.E.2d 1196, 1200 (Ind.App.1984). Although the Indiana Supreme Court has not decided the issue, it seems likely that it would follow the lower courts' interpretation of the IFA.
 
 
 19
 The McNeelys argue that the IFA "on its face" authorizes a private action. They point to various snippets of the Act such as "a person who recovers judgment for a violation may recover [relief]," Ind.Code Sec. 23-2-2.5-28, or "a person may not maintain an action to enforce any liability ... unless brought before the expiration of three years," Ind.Code Sec. 23-2-2.5-30. But none of these provisions contradict the Indiana courts' holding that there is only a private right of action for fraud, deceit or misrepresentation; they are merely general provisions describing the relief available under the Act, the statutes of limitation and like matters.
 
 
 20
 Moreover, that the IFA is a broad remedial statute does not tell us that its remedies may be pursued by private plaintiffs. The IFA instead delegates enforcement authority to the secretary of state, the securities division and the Commissioner of Securities. Ind.Code. Sec. 23-2-2.5-47.[4] In any event, given that Indiana's appellate courts have held against the contentions of the plaintiffs, these general policy arguments alone do not convince us that the Indiana Supreme Court would imply a private right of action for violations of the Act's disclosure provisions. We therefore agree that the McNeelys do not have a private right of action for violations of Secs. 23-2-2.5-9 & 10. Cf. McCoy v. Richards, 771 F.2d 1108, 1110 (7th Cir.1985).
 
 IV.
 
 21
 After a bench trial, the district court granted judgment in favor of Hardee's on the plaintiff's claims under the Indiana Franchise Act, Indiana common law and Arkansas common law. The plaintiffs argue that the district court applied incorrect legal standards to each of these determinations.
 
 A. Indiana Franchise Act
 
 22
 The McNeelys first contend that the district court erred in determining that Hardee's was not liable under the anti-fraud provision of the IFA, Ind.Code Sec. 23-2-2.5-27. Section 27 of the IFA provides:
 
 
 23
 It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly: (1) To employ any device, scheme, or artifice to defraud; (2) To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or (3) To engage in any act which operates or would operate as a fraud or deceit upon any person.
 
 
 24
 Ind.Code Sec. 23-2-2.5-27. At the time of the district court's decision, private recovery actions under Sec. 27 required a showing of a material misrepresentation of a past or existing fact, made with knowledge or reckless disregard of its falsity, on which the plaintiff detrimentally relied. Master Abrasives, 469 N.E.2d at 1200; Enservco, Inc. v. Indiana Securities Div., 605 N.E.2d 256, 265 (Ind.App.1992), rev'd, 623 N.E.2d 416 (Ind.1993). The district court denied recovery under the act because Hardee's statements were merely predictions or statements of opinion rather than material facts; as we have already indicated, the McNeelys had not detrimentally relied on these statements; and reliance would be unreasonable.
 
 
 25
 The plaintiffs argue that the subsequent Indiana Supreme Court decision in Enservco, 623 N.E.2d 416 (Ind.1993), proves the district court wrong. Enservco held that the plaintiff in a fraud action under the IFA need no longer prove that a defendant acted knowingly or recklessly. Id. But that holding has no direct relevance to the issue here, which does not involve the IFA's scienter requirement, but rather involves the questions whether there was a misstatement of fact; whether the plaintiffs relied on the misstatement; and whether their reliance was reasonable. The plaintiffs claim Enservco replaced the common law "actual reliance" requirement with some other, presumably more favorable, standard. But Enservco, except for the scienter requirement, clearly did not change the elements of statutory fraud, namely, "a false statement or omission, materiality, and harm caused by reliance on the statement or omission." Id. at 425 (emphasis supplied).
 
 
 26
 The McNeelys also argue that they are entitled to recover under the IFA because Hardee's failed to provide them with information to back up their sales estimates for the Maumelle site in violation of an FTC franchise rule, 16 C.F.R. Sec. 436.1. Section 436.1 forbids a franchisor from making a statement about a specific level of potential sales without providing information showing the basis for that estimate.[5] Hardee's argues that the rule does not apply, since the projections of sales at the Maumelle site pertained only to a proposed company-owned store rather than to actual sales the plaintiffs could expect. But in any event, and as we have noted, the district court found that the plaintiffs did not rely on the sales figures, and hence could not have benefited from the omitted bases of the estimates. Since the district court found that the plaintiffs did not rely on Hardee's representations when entering the Maumelle transaction, the plaintiffs have failed to prove an essential element of a claim under the IFA, and we can affirm the district court's denial of relief on that ground alone.
 
 
 27
 The McNeelys argue, however, that the district court improperly considered whether their reliance on Hardee's statements was reasonable. The IFA, they contend, has abandoned the common law requirement of reasonable or justifiable reliance. But lower Indiana courts have read a "reasonable reliance" requirement into fraud under the IFA. Master Abrasives, 469 N.E.2d at 1201. Enservco did not disturb these holdings, and absent any other indication that the IFA intended to disturb the other common law elements of fraud, see Whiteco Properties, Inc. v. Thielbar, 467 N.E.2d 433, 437 (Ind.App.1984), we would follow the holdings of the lower Indiana courts that the IFA requires proof of reasonable reliance. In fact, we do not really have to reach this question, however, since the district court found no actual reliance.
 
 
 28
 The McNeelys also argue that the district court improperly characterized Hardee's representations as "opinions" or "predictions" rather than facts. The district court concluded that Hardee's earnings projections and the statements of Hardee's employees about opportunities to buy company-owned stores were mere speculation, and thus were not actionable. Vaughn v. General Foods Corp., 797 F.2d 1403, 1411 (7th Cir.1986), cert. denied, 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987); Peterson Industries, Inc. v. Lake View Trust and Sav. Bank, 584 F.2d 166, 169 (7th Cir.1978). Again, since we may affirm the district court on the basis of there being no actual reliance, the question of fact versus opinion is not dispositive. We agree, however, that at least some of Hardee's statements were false statements of fact. For example, in July 1990, Lee and Mosbacher told McNeely and Eubanks that company-owned stores were presently for sale; in September, Lee told McNeely that all of the company-owned stores were for sale. These are verifiable statements of fact rather than mere opinions, and Lentz testified that they were false. Some of the other statements--such as more generalized claims that the plaintiffs might be able to buy company-owned stores or that certain sites would be excellent spots for development--may be closer to predictions or opinions than to actual facts. But, as indicated, since the district court found that the plaintiffs had not relied on these misstatements, the plaintiffs cannot prevail even with respect to assertions of fact.[6]
 
 B. Indiana common law claims
 
 29
 The district court also held that the McNeelys could not recover for fraud under Indiana common law because they had not actually relied on Hardee's representations.[7] It is well settled that a plaintiff seeking recovery for fraud must prove that the defendant made a material misrepresentation of past or existing facts; that the representation was false and made with knowledge or reckless ignorance of falsity; and that the misrepresentation caused the plaintiff to rely on the misrepresentation to her detriment. Whiteco Properties, 467 N.E.2d at 436; see also Vaughn, 797 F.2d at 1410, 1415. The McNeelys contend that the district court applied an incorrect standard of reliance, but most of their arguments address the district court's factual findings, not its legal analysis. The McNeelys' particular twist is the claim that the district court ignored the effect of the omissions of Hardee's representatives regarding the sale of company-owned stores: that approval was needed from Lentz before stores could be sold; that such approval had never been given; and that no Arkansas stores were for sale at that time.
 
 
 30
 But it appears that the district court did consider these very circumstances. The district court found that the plaintiffs knew that additional approval was needed before they could buy a company-owned store. The entire thrust of the district court's conclusion was that the plaintiffs did not enter into the Maumelle franchise based on how much, or how little, they knew about the "build one-buy one" policy. The McNeelys argue in part that a plaintiff need not prove reliance if she is alleging fraud based on omissions rather than on affirmative misrepresentations. But reliance is an essential element of any fraud case, in effect supplying the causal link between the alleged tortious act and the plaintiff's harm. See Indosuez Carr Futures, Inc. v. Commodity Futures Trading Comm'n, 27 F.3d 1260, 1265 (7th Cir.1994). Even when a defendant has omitted material information, a court cannot find liability unless the omission actually caused the plaintiff's harm--and "reliance is one way to supply this causal connection." Rowe, 850 F.2d at 1233, quoting Basic, Inc. v. Levinson, 485 U.S. 224, 241, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). Thus a plaintiff must convince the trier of fact that he acted to his detriment based upon his ignorance of the omitted information. The district court engaged in the proper analysis by determining whether the plaintiffs in fact entered the Maumelle franchise based upon a belief that the sales of the Maumelle store would be at least $800,000 or that they would be allowed to purchase company-owned stores. The district court concluded, based on all of the evidence, that the plaintiffs did not proceed based on these beliefs.
 
 
 31
 Moreover, even if the district court had concluded differently, the McNeelys would still be barred from recovery based on the district court's finding that reliance on Hardee's statements would have been unreasonable. For the same reasons, reliance on the omission of information would have been unreasonable.
 
 C. Arkansas claims
 
 32
 Arkansas law governs the claims brought by Ronald and Sharon Eubanks, M-E and HOMAI. They argue that the district court should not have applied a "reasonableness" standard to their claims for fraud, constructive fraud and fraudulent concealment. The plaintiffs rely solely on two Arkansas cases holding that a buyer has no duty to investigate a seller's representations. Whaley v. Niven, 175 Ark. 839, 1 S.W.2d 3 (1927); Fausett & Co. v. Bullard, 217 Ark. 176, 229 S.W.2d 490 (1950). The absence of a duty to investigate, however, is not a license to ignore clear risks or make unwarranted leaps of faith. And it is well settled that fraud under Arkansas law includes all of the common law elements--including the requirement of reasonable reliance. Interstate Freeway Services, Inc. v. Houser, 310 Ark. 302, 835 S.W.2d 872, 873-74 (1992); see also New Equity Sec. Holders Committee for Golden Gulf, Ltd. v. Phillips, 97 B.R. 492, 501 (E.D.Ark.1989) (reasonable reliance required for fraudulent concealment claim); Cardiac Thoracic and Vascular Surgery, P.A. Profit Sharing Trust v. Bond, 310 Ark. 798, 840 S.W.2d 188 (1992) (reasonable reliance required for constructive fraud claim). As indicated, this requirement is unchanged whether the plaintiffs claim to have relied on omissions or affirmative misstatements. The district court did not err in requiring the plaintiffs to prove that they reasonably relied on Hardee's representations.V.
 
 
 33
 For the reasons given above, the decisions of the district court are
 
 
 34
 AFFIRMED.
 
 
 
 *
 The Honorable James B. Moran, Chief Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Applying Indiana's choice of law rules, the district court determined that the McNeelys' claims are governed by Indiana law and the other plaintiffs' claims are governed by Arkansas law. The district court characterized the plaintiffs' claims under the Indiana Franchise Act and common law as tort, rather than contract, claims. Indiana applies a traditional lex loci delicti rule to tort claims, inquiring where the last event necessary to give rise to liability (typically, the injury) occurred. See Castelli v. Steele, 700 F.Supp. 449, 451-52 (S.D.Ind.1988). The court must then determine that this place bears a sufficient connection to the legal action; if not, the court considers additional factors. Id. at 452; Hubbard Mfg. Co., Inc. v. Greeson, 515 N.E.2d 1071, 1073 (Ind.1987). The district court found that the McNeelys, who were Indiana residents, suffered their injuries in Indiana. Since Indiana had a connection to the litigation, the district court ruled that the McNeelys' tort claims were governed by Indiana law
 But the district court found that the Eubanks' tort injuries occurred in Arkansas, where they lived and ran the Maumelle franchise. Likewise, the district court found that both M-E and HOMAI had their principal places of business in Arkansas and suffered their injuries there. Thus the district court found that Arkansas tort law applied to the claims brought by the Eubanks, M-E and HOMAI, and they therefore could not maintain claims under the Indiana Franchise Act or Indiana common law.
 
 
 [2]
 The licensing agreement provided:
 This agreement, the documents referred to herein, and the Exhibits attached hereto, if any, constitute the entire, full and complete agreement between LICENSOR and LICENSEE concerning the subject matter hereof, and supersede all prior agreements, no other representation having induced LICENSEE to execute this Agreement, and no representations, inducements, promises or agreements, oral or otherwise, not embodied herein or attached hereto (unless of subsequent date) were made by either party, and none shall be of any force or effect with respect to the Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed in writing.
 
 
 [3]
 Section 9 provides that:
 No person may offer or sell any franchise: (1) Unless the franchise is registered under this chapter or is exempt from such registration under sections 3 through 5 of this chapter; and (2) Without first providing to the prospective franchisee at least ten (10) days prior to the execution by the prospective franchisee of a binding franchise or at least ten (10) days prior to the receipt by the franchisor of any consideration, whichever first occurs, a disclosure statement together with a copy of all proposed contracts relating to the sale of a franchise.
 Section 10 provides in relevant part:
 An application for registration shall include:
 (o) A copy of any statement of estimated sales or earnings prepared for presentation to prospective franchisees, together with a statement setting forth the data upon which the estimates are based, including, where applicable, data with respect to the sales and earnings history of existing franchisees, as a group, including the sales and earnings of the least profitable and the most profitable of such existing franchises, without naming them....
 Ind.Code Secs. 23-2-2.5-9 & 10.
 
 
 [4]
 Ind.Code Sec. 23-2-2.5-47 provides:
 All provisions of this chapter delegating and granting power to the secretary of state, the securities division and the commissioner shall be liberally construed to the end that the practice or commission of fraud may be prohibited and prevented, disclosure of sufficient and reliable information in order to afford reasonable opportunity for the exercise of independent judgement of the persons involved may be assured, in connection with the issuance, barter, sale, purchase, transfer or disposition of franchises in this state. It is the intent and purpose of this chapter to delegate and grant to and vest in the secretary of state, the securities division and the commissioner full and complete power to carry into effect and accomplish the purpose of this chapter and to charge them with full and complete responsibility for the effective administration thereof.
 
 
 [5]
 The Rule provides in part:
 In connection with the advertising, offering, licensing, contracting, sale, or other promotions ... of any franchise ... it is an unfair or deceptive act or practice ... for any franchisor or franchise broker:
 (b) To make any oral, written or visual representation to a prospective franchisee which states a specific level of potential sales, income, gross or net profit for that prospective franchisee, or which states other facts which suggest a specific level, unless:
 (1) At the time such representation is made, such representation is relevant to the geographic market in which the franchise is to be located;
 (2) At the time that such a representation is made, a reasonable basis exists for such representation and the franchisor has in its possession material which constitutes a reasonable basis for such representation, and such material is made available to any prospective franchisee....
 
 
 [16]
 C.F.R. Sec. 436.1
 
 
 [6]
 The plaintiffs also argue that under the Indiana Franchise Practices Act, Ind.Code Sec. 23-2-2.5-1 et seq., fraud includes "any misrepresentation in any manner of a material fact, any promise or representation or prediction as to the future not made honestly or in good faith, or the failure or omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading." Ind.Code Sec. 23-2-2.5-1(f). Applying this definition, even predictions not made in good faith would be actionable. However, the plaintiffs would still have to prove that they relied on these predictions
 
 
 [7]
 Hardee's argues that the plaintiffs have waived this claim by failing to raise it during the trial. Although the district court noted that the plaintiffs may have abandoned their claim, it nonetheless considered the merits, and thus we will do the same